Herbert M. GANNET, Plaintiff,

v.

FIRST NATIONAL STATE BANK OF
N. J., Defendant.

UNITED STATES of America and Carl
E. Reichelt, Special Agent of the Internal Revenue Service, Plaintiff,

v.

FIRST NATIONAL STATE BANK OF
N. J., Defendant,

v.

Herbert M. GANNET, Intervenor.

Civ. Nos. 75–2028, 76–124.

United States District Court,
D. New Jersey.

March 19, 1976.

Harvey R. Poe, Newark, N.J., for Gannet.

Shanley & Fisher, by John J. Francis, Jr., and Charles M. Costenbader, Newark, N.J., for First National State Bank of N.J.

Jonathan L. Goldstein, U. S. Atty., by Z. Lance Samay, Geo. E. Mittelholzer, Newark, N.J., William Robertson, and Andrew M. Higgins, Asst. U. S. Attys., Newark, N.J., and by Gerald C. Miller,

Tax Div., Dept. of Justice, Washington, D.C., for United States and Reichelt.

## OPINION

BIUNNO, District Judge.

In this case, some of the facts are not in dispute; others are assumed for the purpose of this determination.

The undisputed facts are as follow. In the due course of the mails, the Internal Revenue Service Center (IRS) at Holtsville, N.Y., received a certified letter from Herbert L. Zuckerman, Esq., a Newark attorney, dated November 4, 1974. The letter enclosed a cashier's check, number 488562, issued by National Newark & Essex Bank, payable to IRS, for $142,497.81.

The letter said that the check represented additional amounts due from "a taxpayer for past years"; that Mr. Zuckerman did not know the taxpayer's name, and that the aggregate additional amount, "together with interest computed to November 5, 1974" totalled the amount of the check.

It further said that Zuckerman was informed that taxpayer was not aware of any investigation in process by IRS, and that taxpayer's attorney had concluded that additional taxes were due and recommended that payment be made. Finally, it asked that the check be deposited in the Deposit Fund Account of the Treasury of the United States, or in such other account as appropriate "for unidentified collections".

An IRS official, informed of the letter and check, instructed a special agent to try to find out who the taxpayer was. The first stage of inquiry produced information that the source of the funds for the cashier's check was a check, No. 1186, drawn by Herbert M. Gannet Trust Account at First National State Bank of N.J. (FNSB) to Zuckerman, dated November 4, 1974, in the amount of $142,497.81.

On October 3, 1975, IRS issued an administrative summons (26 U.S.C. § 7602) to FNSB asking for all negotiable instruments and deposit tickets relating to the source of the funds used for the Gannet/Zuckerman check, as well as monthly bank statements and deposit tickets for $1,000 or more for the period October 1 through November 4, 1974, in the Gannet account.

This inquiry produced the information that two cashier's checks were deposited in the Gannet account, these having been purchased at FNSB's Port Newark branch office on October 31, 1974, in the amounts of $65,182.66 and $77,315.15 (total, $142,497.81).

On November 19, 1975, IRS issued another administrative summons to FNSB, returnable December 2, 1975, asking for the name, address and social security number of the purchaser of the cashier's checks, and for all documentation relative to the source of the funds used to purchase the checks.

Meanwhile, and about October 31, 1975, FNSB informed Gannet of the first summons and that it had furnished the two cashier's checks to IRS. On about November 3, 1975, Gannet served a written demand on FNSB that it not furnish any further information on his trust account to IRS, and that it advise IRS that it would refuse to furnish such further information.

When the second summons was served on November 19, 1975, FNSB informed Gannet of it, although it was not directed to Gannet's trust account, and Gannet filed in this court the first of the two pending actions, Civil No. 75–2028. With the filing of the complaint, Gannet sought an order to show cause why FNSB should not be enjoined from obeying the summons, along with a temporary restraint.

This application was heard November 26, 1975 on informal notice to FNSB and, at the court's direction, to IRS, which appeared *amicus curiae*.

The assumed facts are that some individual, partnership or corporation consulted Gannet about a potential tax liability for past years. Presumably, calculations were made of deficiencies and of

interest thereon for the years involved. Presumably legal advice was given in respect to taxpayer's obligations, in respect to civil and criminal statutes of limitations, and in respect to available options for dealing with the matter. Presumably, the taxpayer chose to make a voluntary payment of deficiencies and interest in a way calculated to avoid disclosing his identity. Presumably, it was conceived to be desirable for Gannet to engage Zuckerman to write the letter to IRS and to obtain and forward the cashier's check.

These assumed facts are fairly evident from what was done by the taxpayer, by Gannet and by Zuckerman in dealings with third parties. The taxpayer, or someone acting for him, dealt with someone at the Port Newark Office of FNSB to purchase two cashier's checks on October 31, 1974. The checks were deposited in Gannet's trust account, and he drew a check to Zuckerman for their total. That check was used by Zuckerman to buy a cashier's check in the same amount, and this check he sent to IRS with his letter of November 4, 1974, making the disclosures noted above.

The argument for Gannet in the first case was grounded on the attorney-client privilege, F.Ev. Rule 501, and on N.J. Court Rule R.1:21–6, requiring all attorneys to establish and maintain trust accounts for clients' funds, separate and apart from other bank accounts.

The order to show cause and interim restraint were denied, first on the ground that disclosure of the identity of the client does not come within the scope of the privilege, and second that the administrative summons was directed to third-party records, i. e., FNSB records, and did not call on the attorney to make any disclosure.

An appeal was taken, but while it was pending the second suit was filed, this by IRS against FNSB, to compel compliance with the summons. An order to show cause why the summons should not be ordered enforced was issued, returnable February 23, 1976, with a schedule for filing answers and briefs, and for an opportunity to Gannet to apply for intervention.

At the hearing, Gannet was allowed to intervene in the second case, and both cases were ordered consolidated for all purposes. This places before the court all parties in interest except the taxpayer, whose interests are represented by Gannet, and permits dealing effectively with the merits.

During the hearing, Gannet was called to the stand by the United States. After stating that he was a member of the bar of New Jersey and of this court, he was asked, in substance, the following questions, with the results indicated:

Q. 1: Did you purchase the two cashier's checks at the Port Newark Office of FNSB? (not answered)

Q. 2: What was used to buy the two cashier's checks, currency, treasury bills, certificate of deposit or whatever? (not answered)

Q. 3: Do you know what medium of exchange was used to purchase these checks? (not answered)

Q. 4: Are you the taxpayer for whom the check was sent to IRS? A: No

Q. 5: Who is the real party in interest for whom you acted? (not answered)

In respect to each question not answered, an objection was made and overruled. The witness' attention was directed to 28 U.S.C. § 1826 and its provision that whenever a witness refuses, without just cause, to comply with an order to testify, the court may summarily order his confinement in a suitable place until such time as the witness is willing to testify as ordered. Gannet was so ordered, and on his refusal to testify (grounded on the attorney-client privilege) he was summarily ordered to be confined.

Basically, three questions of law are presented:

(1) May Gannet be required to disclose the identity of his client, or is that information within the scope of the attorney-client privilege?

(2) Is information embodied in bank records brought within the scope of the attorney-client privilege by reason of the provisions of N.J. Court Rule, R.1:21–6?

(3) Is the information sought by the present summons, i. e., bank records and bank testimony about the purchase of the two cashier's checks and the source of the funds used, within the scope of the attorney-client privilege?

■ Disposition of the first question is governed by F.Ev. Rule 501, which provides, in pertinent part, that "the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." There is one exception, namely when otherwise required by the U.S. Constitution, or by Act of Congress or in rules prescribed by the Supreme Court under statutory authority. That exception does not apply here. The second exception is that in civil matters, where State law supplies the rule of decision on an element of a claim or defense, then the privilege is determined by State law. That exception does not apply here since this matter solely relates to federal taxes.

In the original version approved by the Supreme Court on November 20, 1972, Rule 503 dealt explicitly with the attorney-client privilege. Neither the text of the rule nor the note of the Advisory Committee addressed the question here involved. The same is true of the Senate, House and Conference Committee Reports on P.L. 93–595, which was enacted as the Federal Rules of Evidence. (Senate Report No. 93–1277; House Report No. 93–650; Conference Report No. 93–1597, U.S.Code Cong. & Admin.News 1974, p. 7051).

■ Two decisions in this circuit do deal with the specific question. *In re Semel,* 411 F.2d 195 at 197 (CA 3, 1969); *Mauch v. C. I. R.,* 113 F.2d 555 at 556–7 (CA 3, 1940). The same result has been reached in New Jersey, a common law state. *State v. Toscano,* 13 N.J. 418, at 424–5, 100 A.2d 170 (1953); *In re Rich-*

*ardson,* 31 N.J. 391 at 396–401, 157 A.2d 695 (1960). These decisions, from their internal discussion, analysis and precedents cited, appear to reflect the overwhelming weight of authority. See also, Annotation, 16 A.L.R.3d 1047; 15 A.L.R. Fed. 771. The privilege does not embrace the client's identity.

The second question must be answered with the conclusion that R.1:21–6 does not affect the result. In the first place, the provisions of that Rule are the equivalent of a State statute, in execution of the authority placed in the Supreme Court of New Jersey by N.J. Const.1947, Art. 6, § 2 par. 3, dealing with "admission to the practice of law and the discipline of persons admitted." Since State law does not supply the rule of decision for any element of the claim or defense in this case, it cannot apply, F.Ev. Rule 501.

■ Beyond that, even if State law applied, the rule relied on does not say what Gannet claims. R.1:21–6(a) requires New Jersey attorneys to keep separate accounts in a financial institution in New Jersey (1) for the deposit of all funds entrusted to their care, called a "trustee account", and (2) a business account for the deposit of all funds received for professional services.

R.1:21–6(b) separately requires the keeping of *records* by attorneys, for a period of 7 years, showing deposits and withdrawals in the bank accounts; ledgers for all trustee accounts showing the sources of funds deposited, the persons for whom held, the amounts, the charges or withdrawals and to whom paid; copies of all retainer and compensation agreements; copies of statements to clients showing disbursements to or for them; copies of bills to clients; and copies of records showing payments to other attorneys and others, not in their regular employ, for services rendered or performed.

R.1:21–6(f), on which Gannet relies, directs that "any of the *records* required to be kept" by the rule are to be produced on subpoena duces tecum in an ethics

committee matter or before the Supreme Court; and "when so produced" all such *records* shall "remain confidential" and shall not be disclosed in a way that would violate the attorney-client privilege.

This provision does not apply to the bank account, but to the *records* called for by R.1:21–6(b). It does not create any privilege; it requires disclosure in ethics proceedings and says that despite such disclosure whatever was privileged is to remain privileged. In this respect it reflects the principle of N.J.Ev. Rule 37, namely that "a disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section." See also, the last sentence of proposed F.Ev. Rule 511 (1972), not adopted.

■ The answer to the third question clearly is that no privilege is involved. *Schulze v. Rayunec,* 350 F.2d 666, at 668–9 (CA 7, 1965), the companion case to *Tillotson,* mentioned below, dealing with an IRS summons to produce bank records. These are obviously third-party disclosures which are not part of a "confidential communication between attorney and client." Also pertinent is *Harris v. U. S.,* 413 F.2d 316 at 320 (CA 9, 1969), holding that when an attorney acts as a transmitter of funds, he stands in the same position as a banker, and no confidential relationship arises; and also *SEC v. First Security, etc.,* 447 F.2d 166 at 167 (CA 10, 1971) and cases there cited.

When the unidentified taxpayer went to the Port Newark office of FNSB to arrange to buy the two cashier's checks which are the subject of the summons, the transaction and any conversation that took place could not have been a privileged communication between attorney and client.

IRS has a perfectly lawful objective in seeking out by investigation the identity of the undisclosed taxpayer. On the civil side alone, it is entitled to verify that the amount paid for taxes and interest is the correct amount; it may be entitled to claim civil penalties as well. And it is entitled to check these and other questions without delay to avoid the bar of the statute of limitations for any taxable year, which normally arises on April 15 of each year.

Gannet's major argument rests on two federal decisions: *Baird v. Koerner,* 279 F.2d 623, 95 A.L.R.2d 303 (CA 9, 1960); and *Tillotson v. Boughner,* 350 F.2d 663 (CA 7, 1965). Both cases involved a situation in which an attorney sent IRS a cashier's check on behalf of an unidentified client to pay a tax obligation. In both cases, an IRS summons was issued to the attorney calling on him to disclose the client's identity.

In *Baird,* the Court of Appeals conceived that the point was governed by California law, which it determined to embrace the identity of the client within the privilege. In *Tillotson,* the Court of Appeals noted that Illinois law was silent on the point, and relied on *Baird* as reflecting federal law (which it did not).

*Baird* cannot apply because of F.Ev. Rule 501. *Tillotson* was in error, overlooking the fact that *Baird* was grounded on California law. Neither case is controlling here, since the Court of Appeals for the Third Circuit has ruled the other way (and in accordance with the weight of authority) in both *Semel* and *Mauch,* supra.

In some other case than this one, the difficulties raised by the broad language of F.Ev. Rule 501 will need to be faced. Here, the law of New Jersey on the point coincides with that of the Third Circuit; there is no conflict.

But, in some other case, where the rules are different, or, perhaps, in the Congress, the question ought to be considered whether the privileged character of a confidential communication ought to attach to it and be part of it no matter what the forum in which the evidence is sought.

The privileged character of recognized confidential communications is inevitably grounded on policy considerations quite apart from the needs of a judicial or

administrative proceeding. The only sensible way for achieving such a policy is to honor the privilege in all forums.

The marital privilege, for example, should be governed by the law of the marital domicile and should apply to communications made on a trip to Timbucktoo where, let us say, there is no privilege, whether the question later arises in a civil or criminal case, in a State or Federal Court.

So, too, with the attorney-client privilege, the tenor of which should be that of the State where the lawyer practices, the "home base" for his representation of the client, no matter how many conferences they may have in other jurisdictions.

Such an approach would embody some difficulties in resolving matters of conflict of laws, but these would be nothing compared to the difficulties faced by the participants in the communication under any other rule.

This case does not involve the problem, but its existence under F.Ev. Rule 501 is worth noting, along with one point of view.

The application for an order directing FNSB to respond to the summons is granted, and no stay pending appeal will be allowed except as may be ordered by the Court of Appeals. Gannet is ordered to be confined until he is ready to answer the questions he refused to answer; that confinement is stayed until the Court of Appeals grants or denies a stay on the order enforcing the summons. The motion to quash the summons is denied.

In the first of these consolidated cases, the court directed FNSB, as a condition of stay pending application to the Court of Appeals, that it deposit with the court in a sealed envelope, such documentation in response to the summons as it had gathered by 4 PM of Monday, December 1, 1975.

At the hearing of February 23, 1976, the court stated that it would continue to hold these sealed papers until the Court of Appeals had either granted or denied a stay pending appeal of the order to enforce the summons. That stay having been denied on March 8, 1976, the sealed papers will now be turned over to IRS.

Since these papers may or may not provide the name of the taxpayer, IRS may apply *ex parte* for a bench warrant for Gannet's arrest and confinement until he is ready to answer the questions listed above. On the return of the warrant and before confinement, he will be given another opportunity to answer.

The stay of the confinement which was granted was to last only until the Court of Appeals had acted on the motion for stay of the order enforcing the summons. Since that motion has been denied, the confinement order is now in full force and effect.

### SUPPLEMENT TO OPINION

Since filing the above opinion, the Court has learned that on March 11, 1976, by a divided vote, the Court of Appeals granted a stay of the Order of Summary Confinement pending disposition of the Appeal, and until the further Order of the Court. Consequently, application for a bench warrant will not be entertained at this time.